129 So.2d 606 (1961)
Succession of Johnny SHADRICK, Deceased.
No. 9459.
Court of Appeal of Louisiana, Second Circuit.
April 12, 1961.
Rehearing Denied May 10, 1961.
Certiorari Denied June 20, 1961.
*607 W. Jackson Emmons, Jonesboro, for appellants.
James Sharp, Jr., Monroe, Vanue B. Lacour, Baton Rouge, for appellee.
Before GLADNEY, AYRES and BOLIN, JJ.
GLADNEY, Judge.
Johnny Shadrick died intestate on June 27, 1958, while residing in and a domiciliary of Jackson Parish. At the time of his death he had on deposit in a Detroit bank a sum in excess of $18,000.00. The entire account was withdrawn on July 10, 1958, by Willie Shadrick, who claims the funds by virtue of a trust allegedly created for his benefit by the deceased. Petitioners, four of the seven surviving brothers and sisters of the decedent, instituted this action as heirs in law to the estate of Johnny Shadrick for the purpose of forcing Willie Shadrick to produce the money so withdrawn by him in order that it may be distributed according to the succession laws of this state. After disposition of a number of preliminary motions and exceptions, none of which are urged upon this appeal, the judge a quo tried the case on its merits and rendered judgment favorable to the defendant, Willie Shadrick. Petitioners have appealed.
The evidence disclosed by the record is in many instances most unsatisfactory. Certain facts, however, are firmly established. Johnny Shadrick was born during 1915 and reared in Hodge, Louisiana. After attaining manhood he left his home, and the record is silent as to his whereabouts and actions in the ensuing twenty years. He was never married and we assume he resided in the State of Michigan for several years prior to November 16, 1955. On that date he was sentenced to serve a term of imprisonment in the State Prison of Southern Michigan, from which institution he was paroled May 15, 1957. Arrangements for his probation were made with a parol officer located in Louisiana, and shortly after May 17, 1957, he returned to Hodge, Louisiana, where, until the time of his death a little more than a year later, he resided among his brothers and sisters.
On May 17, 1957, Johnny Shadrick appeared at The Michigan Bank in Detroit, Michigan, where his business was attended to by Mrs. Betty Jagusch, an employee of the bank. She received from Shadrick a deposit of $850 and had him execute a signature card. Mrs. Jagusch testified by deposition that he told her Louisiana was his home, and she explained to him the different accounts available to him, after which he decided upon a savings account and informed her that he wanted to be able to draw on the account but wished to have the account in trust for his brother, Willie Shadrick. The signature card which was then executed is entirely imprinted or typewritten, except for a signature which is signed "Johnie Shadrick". We reproduce herewith the card, which as to words and figures, reads:
 "Shadrick, Johnie Main Office 
 0-00760 In Trust for Willie Shadrick 
(1) (We) hereby agree to the By-Laws, Rules and
 Regulations of The Michigan Bank
Signature Johnie Shadrick Age 
Signature Age 43 
 General Delivery
Address Hodge, Louisiana Post Office 
 Where two signatures are given either
 may sign withdrawals
=====================================================
 Identification of Beneficiary
=====================================================
Birthplace Hodge, Louisiana Date of Birth 1915
-----------------------------------------------------
Mother's Name Relationship to Trustee
Before Marriage Walton Brother
-----------------------------------------------------
 Initial
Date 5/17/57 Deposit $850.00 Opened By Jay"
Thereupon a savings book or passbook was issued reflecting the deposit of May 17, 1957. Other than the subsequently inscribed deposits and withdrawals, the only handwriting in the book is No. 0-00760, which is the identical number of the signature card. There also appears therein a printed notation to the effect the book is accepted and all deposits are made subject to the rules and regulations of the bank as therein printed and made a part of the deposit *608 contract. In the back of the book are the printed rules and regulations governing saving deposits. The book discloses that three deposits, exclusive of interest, were made in the account. These were: $850 on May 17, 1957, $446.72 on March 3, 1958, and $17,000 on March 3, 1958. Two withdrawals were made: $500 on March 3, 1958, and $18,080.34 on July 10, 1958. Willie Shadrick testified that on July 10, 1958, he withdrew the entire bank balance after identifying himself as Willie Shadrick, and furnishing a certificate of death of Johnny Shadrick.
The testimony reveals much dissension among the heirs as to the retention of the money by Willie Shadrick and the record is replete with discrepancies and obviously false testimony. It seems to us that witnesses for both sides fabricated answers which, in their opinion, seemed to fit the occasion. From this unsatisfactory data we infer that the deceased kept secret the deposits entered on March 3, 1958, although previously he had disclosed the bankbook entries of May 17, 1957 to Alfred Rushing who assisted Johnny Shadrick in drafting the check for $500 but apparently knew nothing of the deposits made about that time. We also believe that neither Willie Shadrick nor his wife had any knowledge of the deposits made on March 3rd until after the death of Johnny Shadrick when the bankbook and some other papers were found in the effects of the deceased. The inference from the foregoing circumstances seems clear that Willie Shadrick did not see the signature card and had no knowledge of the trust status of the account in the Detroit bank until he contacted the bank after the death of Johnny Shadrick. Several witnesses testified Johnny Shadrick declared his intention that his money was to be divided among his sisters and brothers, whereas others said that Johnny had "willed" his money to Willie and his children. Much of the testimony is so uncertain and conflicting it appears unworthy of belief. We cannot accept it as having probative value indicative of the deceased's intent as to the disposition of his money. We are firmly of the opinion that the only trustworthy evidence that Johnny Shadrick intended for Willie to receive the deposited funds must be found in the testimony of Mrs. Jagusch, and as reflected by the signature card.
Johnny Shadrick was a Negro of little education and a person of loose morals, addicted to heavy drinking. It cannot be said that his family ties were very close. Roxie Shadrick is quoted as stating she did not want Johnny Shadrick to stay at her house as her children were afraid of him. Lula Rushing was cut on the arm by the deceased during one of his drunken sprees. We find no circumstances which indicate any particular reason why Willie Shadrick should be preferred over any of the other brothers and sisters. During the last year of his life Johnny Shadrick lived with first one and then another of his brothers and sisters. So far as the record indicates, the bank account constituted the entire means of Johnny Shadrick who at the age of forty-three had reason to expect a substantial continuance of life. These factors and the other circumstances as hereinabove mentioned, point to the probability that the account was so deposited primarily for the purpose of serving some convenience of the depositor rather than making any actual disposition for the benefit of Willie Shadrick. We doubt that Johnny Shadrick had any real understanding as to the effect of a trust. Rather, we think, the selection of such an account was prompted more for the convenience of the banking institution than to carry out the intentions of the depositor. With these findings, it is our opinion that there was no intention on the part of the deceased to create a trust.
Trusts were long regarded as dispositions reprobated by the law of this state. LSA-C.C. art. 1520; Art. 4, Sec. 16, Constitution of 1921-LSA. Recognition of private trusts in this state was first attempted by the adoption of Act 107 of 1920. This statute was so ineffectual, particularly in light of *609 the provisions of the Constitution, that the act was repealed by Act 7 of 1935, 3rd Extra Session. However, Act 81 of 1938, LSA-R.S. 9:1791 et seq., The Trust Estates Act, providing for trusts of a limited duration was comprehensive. The above mentioned provisions of the Constitution were amended in 1944 and 1952 to insure the validity and usefulness of the statute. In keeping with our system of statutory law, the Trust Estates Act expressly prescribes the formalities essential to the creation of valid trusts in this state. Among these, inter alia, are requirements that the trust shall transfer legal title to the property involved to a trustee or trustees; the agreement or other appropriate transaction must be in writing, dated and signed by the settlor and the trustee in the presence of two witnesses; and if realty is involved the instrument must be by notarial act. No particular form or words or conduct is deemed necessary for the manifestation of the intention to create a trust. LSA-R.S. 9:1812, 9:1814 and 9:1815.
The proven circumstances herein do not in any wise meet the conditions imposed by our statute, Act 81 of 1938. The transaction between Johnny Shadrick and The Bank of Michigan, in order to be effective as a trust device, must receive support from the laws and jurisprudence of the State of Michigan, which state was the situs of the property involved, and the place of transfer of the bank account. Accordingly, the contention is made by counsel for Willie Shadrick that a trust was validly created in Michigan and is recognized as such by the courts of that state. It is earnestly urged on the other hand by opposing counsel, that title to the personalty involved must be determined by the law of the State of Louisiana, wherein both the settlor and the cestui que trust were domiciled.
As to the question of whether the law of Michigan or the law of Louisiana should apply in determining the validity of the creation and the effect of the trust, reference to the jurisprudence furnishes no precise answer. Arguendo, where the interested parties are domiciled in the State of Michigan, the courts of Louisiana by virtue of the provisions of Art. 10 of the LSA-Civil Code[1] and Article 13 of the Louisiana Code of Practice[2] probably would recognize and give effect to a trust validly created according to the laws of Michigan. However, it frequently occurs that several of the elements which determine the controlling law are attached to each state, and as a result there are numerous conflicting decisions. Especially is this true in the case of inter vivos trusts of personal property, and great uncertainty prevails in the jurisprudence of the several states. In 11 Am. Jur., verbo Conflict of Laws, Sec. 95, pp. 382, 383, we find the observation that it is practically impossible to deduce a uniform rule from the results reached in cases referring the validity, construction and effect of such trusts to the law of situs of the particular element of the transaction. For this reason we pretermit final determination as to which of the two states shall supply the controlling law in the instant case.
*610 Counsel for defendants in support of their contention that a trust was, in fact, created, argue that the subject trust device is referred to as a "Totten Trust", which takes its name from a New York case. As later pointed out, such a trust has received recognition in a number of states although many of these decisions require not only proof that the settlor deposited the money in his name as trustee for another reserving to himself full control with unlimited power of revocation, but other circumstances must be shown as indicia of the depositor's intent to carry out the trust disposition.
The facts of the instant case disclose but little, if any, of such intention. There was no delivery of or surrender of title; possession of the bankbook was retained by the depositor; and the fact that the deposit was in trust, in our opinion was concealed during decedent's lifetime and not actually revealed to Willie Shadrick until after decedent's death, and then only by contact with the bank. The transaction may not be considered as a gift for there was no evidence of delivery and transfer of ownership, nor was there an acceptance by the donee. Additionally, the laws of this state impose formal requirements to a gift of incorporeals, and a bank account, being incorporeal, is not susceptible of manual gift. Art. 1536, LSA-Civil Code.
Legal principles prevailing in many of the common-law states distinguish between a gift and a voluntary trust, in that in the case of the gift the thing itself passes to the donee, while in the case of a trust only the actual beneficial or equitable title passes to the beneficiary. Norway Savings Bank v. Merriam, 1895, 88 Me. 146, 33 A. 840; 96 A.L.R. 383 et seq., Sec. 23, 1 Restatement of Trusts, 2d, commented: "A trust is created only if the settlor properly manifests an intention to create a trust." In re Allshouse, Deceased, 304 Pa. 481, 156 A. 69, 96 A.L.R. 379, it was held that equity will not give effect to an imperfect gift by erecting it into an enforceable trust merely because of the imperfection, and that in order to make a valid inter vivos gift, there must be clear, satisfactory and unmistakable intention of the giver to part with and surrender dominion over the subject of the gift, with the intention to invest the donee with the right of disposition beyond recall, accompanied by an irrevocable delivery, actual or constructive. Many of the cases hold that a voluntary trust which is still executory, incomplete, imperfect or promissory, will neither be enforced nor aided. 3 Pomeroy Equity Jurisprudence, 5th Ed. pars. 996, 1009.
As indicative of the intent of the settlor, there must be either an explicit declaration of trust or other circumstances which show beyond a reasonable doubt the depositor's intention to create a trust. Annotation, 168 A.L.R., page 1273. Evidence of the depositor's intent may be inferred from the family relationship between the settlor and beneficiary; from the depositor's retention of complete control over the deposit; from the depositor's declarations, conduct and statements with reference to the deposit; from withdrawals and deposits in the account; from the depositor's retention or possession of the bankbook; and from the depositor's manifestation of, or failure to impart, his intention to the cestui que trust. 1 Bogart, Trusts and Trustees, Sec. 47.
Evidence of the depositor's intent herein is insufficient to support the existence of a trust. It is true that in certain states evidence of intent is not required in order to create a valid trust other than the mere fact of the deposit made by the decedent and his subsequent death without revocation. Such seems to be the rule in Florida, Seymour v. Seymour, Fla.1956, 85 So.2d 726, cited by appellee. However, that principle does not appear to have met with the approval of the courts of Michigan, and our research has failed to disclose any decisions of that state recognizing that such a banking transaction standing alone constitutes a valid trust.
*611 Defendant contends, however, and the trial judge so held, that the Michigan savings account in decedent's name as trustee for defendant constituted a revocable inter vivos trust which, under the law of Michigan, became irrevocable upon the death of decedent. The trust device so contended for is commonly referred to as a "Totten Trust", which designation arises from the ruling established in the landmark New York case of Matter of Totten, 1904, 179 N.Y. 112, 71 N.E. 748, 70 L.R.A. 711. The Totten trust is explained in Black's Law Dictionary:
"A trust created by the deposit by one person of his own money in his own name as a trustee for another and it is a tentative trust revocable at will until the depositor dies or completes the gift in his lifetime by some unequivocal act or declaration such as delivery of the pass book or notice to the beneficiary and if the depositor dies before the beneficiary without revocation or some decisive act or declaration of disaffirmance the presumption arises that an absolute trust was created as to the balance on hand at the death of the depositor. Murray v. Brooklyn Sav. Bank, 258 App.Div. 132, 15 N.Y.S.2d 915, 917; In re Totten, 179 N.Y. 112, 71 N.E. 748, 70 L.R.A. 711, 1 Ann.Cas. 900."
Evidence of the depositor's intention to create a revocable trust is prerequisite to recognition of such device. However, in New York the mere fact that the account is placed in the name of the depositor "in trust" for another suffices to establish such intention when there is no evidence of the depositor's contrary intention.
Defendant maintains that Michigan has adopted the New York theory of Totten trust, and tenders as authority supporting that contention the case of Boyer v. Backus, 1937, 282 Mich. 593, 276 N.W. 564; Section 487:702 of the Compiled Laws of Michigan of 1948; and Restatement (Second), Trusts § 58. The question presented in the Boyer case was whether a trust savings account in the name of "Joseph Boyer, trustee" was an incident of a prior written instrument of trust, or whether the account created a separate "secondary" trust upon which the terms of the written instrument were unenforceable. The court observed that the opening of the account naturally would be incidental to carrying out the terms of the expressed trust, but that the existence of a secondary trust could be shown by parol. It was then held that the surrounding circumstances did not evidence such "acts and words of a clear and unequivocal character" as is necessary for proving a trust by parol declaration, and further, that the nature and extent of the beneficiary's interest were not shown to be certain. The "secondary" trust therein contended for was rejected. During the course of its opinion the court cited Matter of Totten, supra, for the proposition that the placing of sums in a bank account as trustee for another does not of itself establish a trust.
We are of the opinion that Boyer v. Backus, when considered in the light most favorable to defendant, is inconclusive as to the question of whether Michigan has adopted the New York theory of Totten trust. On the contrary, it would appear from the dicta in the Boyer case relative to trusts by parol declaration that Michigan trust requirements are considerably more onerous than those of New York. See e. g., Mitchell v. Bilderback, 1910, 159 Mich. 483, 124 N.W. 557; Faulds v. Dillon, 1925, 231 Mich. 509, 204 N.W. 733.
Defendant directs our attention to Section 487.702 of the Compiled Laws of Michigan of 1948, which provides:
"When any deposit of money shall be made in any bank or trust company be any person in trust for another, and no other or further notice of the existence and terms of a legal and valid trust shall have been given in writing to the bank, in the event of the death of the trustee, the same, or any part *612 thereof, together with the dividends or interest thereon, may be paid to the person for whom the deposit was made: Provided, however, That if the balance on such deposit shall exceed 100 dollars and such person shall be under the age of 18 years, the same may be paid only to his or her legally appointed guardian, and the receipt or acquittance of such beneficiary or guardian to whom such payment is made shall be a valid and sufficient release and discharge to said depository for all payments so made."
The statute, in our opinion, does not evidence legislative adoption of the Totten trust device. Substantially identical provisions have, in fact, been enacted in Louisiana. LSA-R.S. 6:29. Although our courts as yet have not had occasion to consider the effect of LSA-R.S. 6:29, we have had before us LSA-R.S. 6:32 which, prior to its amendment in 1956, similarly authorized payment of joint deposits to either of the depositors. We held in Northcott v. Livingood, La.App. 2d Cir., 1942, 10 So.2d 401, 402, that LSA-R.S. 6:32 did not have the effect of creating a trust nor a donation inter vivos but was for the purpose of permitting banks to make payment and providing protection for their having done so, and that after such payment claimants of ownership are relegated to future action against the withdrawing depositor. The Northcott case involved a deposit of money by one person to the account of himself and another with the provision that it should be payable to such other person if he survived the depositor. It was held that the party other than the depositor had no right to the fund either by gift or trust, citing Articles 1536 and 1539 of the LSA-Civil Code.
New Jersey courts have on several occasions been called upon to interpret the effect of statutory provisions similar to those of the aforequoted Michigan statute. It was uniformly held that such provisions, although appearing in the trust act as well as the banking statutes, did not incorporate the Totten trust device into New Jersey law. Abruzzese v. Oestrich, 1946, 138 N.J.Eq. 33, 47 A.2d 883. It is true, however, that legislative amendments to the New Jersey statutes, whereby the discretionary "may" was changed to the mandatory "shall", impelled the courts to thereafter recognize a statutory adoption of the New York rules on Totten trusts.
Additionally, the Restatement (Second) Trusts, § 58, comment f., states:
"In many States it is provided by statute that if a deposit is made in a bank in the name of the depositor as trustee for another, and no further notice of the existence and terms of the trust is given in writing to the bank, the bank may, after the death of the depositor, make payment to the beneficiary named. Although these statutes protect the bank in making such payment, they have in some States been construed as not affecting the rights of the beneficiary against the estate of the depositor."
We are, therefore, of the opinion that the aforequoted Michigan statute evidences that State's intention to hold financial institutions blameless for making payments to the named beneficiary of a savings account, and that it does not establish to our satisfaction, Michigan's acceptance of the Totten trust device.
The final authority to which we are referred by defendant as evidencing Michigan's acceptance of the trust device herein contended for, is Section 58 of the Restatement (Second) Trusts, which provides:
"Where a person makes a desposit in a savings account in a bank or other savings organization in his own name as trustee for another person intending to reserve a power to withdraw the whole or any part of the deposit at any time during his lifetime and to use as his own whatever he may withdraw, or otherwise to revoke the trust, *613 the intended trust is enforceable by the beneficiary upon the death of the depositor as to any part remaining on deposit on his death if he has not revoked the trust.
"Comment:
"a. The depositor's intention. If a person makes a savings deposit in a bank in his own name `as trustee' for another person, his intention may be either (1) to create a revocable trust, or (2) to create an irrevocable trust, or (3) not to create a trust. Evidence may be admitted to show which was his intention.

"In the absence of evidence of a different intention of the depositor, the mere fact that a deposit is made in a savings bank in the name of the depositor `as trustee' for another person is sufficient to show an intention to create a revocable trust. To such a trust the rule in this Section is applicable. Such a trust is called a `tentative trust'. Such a trust is often called a `Totten trust', since a leading case establishing its validity is Matter of Totten, 179 N.Y. 112, 71 N.E. 748, [70 L.R.A. 711], (1904)." (Emphasis supplied.)
Although our courts may take judicial notice of the fact Michigan is a common law jurisdiction, we do not consider judicial notice to be a proper vehicle for establishing the alleged fact of Michigan's adoption of the Totten trust device. Several common law jurisdictions have refused, in the absence of express statutory provisions, to sanction the general rule set forth in the aforequoted Section 58. In Fleck v. Baldwin, 1943, 141 Tex. 340, 172 S.W.2d 975, 978, the Texas Supreme Court stated:
"A gift cannot be made to take effect in the future, for the reason that a promise to give is without consideration. Neither can the donor retain the right to use and enjoy the property during his lifetime and direct its disposition after his death in any manner other than by the making of a will. Unless Mrs. Baldwin, therefore, intended at the very time she opened these several accounts and purchased these various stock certificates to pass the equitable title thereto so that the exercise by her of any further dominion over same, except in the fiduciary capacity of trustee, would be wrongful, then no gifts were made or trusts created by such transactions."
Prior to legislation adoption of the savings account trust device, New Jersey courts uniformly held that the style of the account is not, of itself, sufficient proof of the depositor's intention to create a trust. E. g., Abruzzese v. Oestrich, 1946, 138 N.J. Eq. 33, 47 A.2d 882.
We are of the opinion the record of this cause is devoid of any evidence establishing either (1) Michigan's acceptance of the Totten trust doctrine, or (2) if accepted, the extent to which the depositor's intention to create a tentative trust must be shown under Michigan law.
Our courts have held on numerous occasions that where laws of a sister state are relied upon such laws must, in the absence of definite proof to the contrary, be presumed to be the same as ours. E. g., Welch v. Jacobsmeyer, 1949, 216 La. 333, 43 So.2d 678; Sheard v. Green, 1951, 219 La. 199, 52 So.2d 714; Pacific Finance Loans v. Guidry, La.App., Orleans 1953, 69 So.2d 56. Nor do we consider Art. 1391, LSA-Code of Civil Procedure, as requiring the court to take judicial notice of the law of another state except as it is brought to our attention by the record or the briefs. That article, in effect, adopts the Uniform Judicial Notice of Foreign Law Act which has been so construed by jurisdictions where previously enacted. E. g., Strout v. Burgess, 1949, 144 Me. 263, 68 A.2d 241, 12 A.L.R.2d 939.
We summarize our conclusions herein by stating that the record fails to indicate proof of the intention of the decedent to *614 create a valid trust estate, or that such a banking transaction, together with the attendant circumstances, may be held to establish a valid trust recognizable by the law and jurisprudence in the State of Michigan. We have not deemed it necessary to inquire into the issue as to whether the validity of the savings account trust should be governed by the law of Louisiana, the law of the domicile, or whether the law of the State of Michigan, the law of the situs of the res, should be controlling. Our conclusion is that no trust device was created even according to Michigan law. Accordingly, we must also hold that the funds which constituted the deposit in The Bank of Michigan at the time of the death of Johnny Shadrick belong to his estate and not to Willie Shadrick.
Our decision requires reversal of the rulings of the trial court affecting the title and possession of the property in dispute and the taxation of the court costs. Otherwise, the decree is affirmed.
It is, therefore, ordered, adjudged and decreed that there be judgment in favor of plaintiffs and against the defendants, recognizing the Succession of Johnnie Shadrick as the owner of and as such vested with full title and right of possession in and to the sum of $18,080.34, being the amount withdrawn from the Michigan Bank and unlawfully retained by Willie Shadrick.
It is further ordered that this case be remanded to the Second Judicial District Court for the Parish of Jackson for further proceedings consistent with the decree of this court, with full reservation of any and all rights of the plaintiffs herein to take such appropriate legal measures as may be necessary and proper for procurement of said money for distribution in the succession proceedings. All accrued costs, including costs of appeal, are taxed against defendants. Future costs are to be taxed in the succession proceedings.
Affirmed in part, reversed in part and remanded.
NOTES
[1] "The form and effect of public and private written instruments are governed by the laws and usages of the places where they are passed or executed.

"But the effect of acts passed in one country to have effect in another country, is regulated by the laws of the country where such acts are to have effect.
"The exception made in the second paragraph of this article does not hold, when a citizen of another State of the Union, or a citizen or subject of a foreign State or country, disposes by will or testament, or by any other act causa mortis made out of this State, of his movable property situated in this State, if at the time of making said will or testament, or any other act causa mortis, and at the time of his death, he resides and is domiciliated out of this State."
[2] "Law of placeWhen governsThe forms, the effects, and the prescription of actions, are governed by the law of the place where they are brought; but contracts are governed by the law of the place where they were entered into."